UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GENERAL PETROLEUM GmbH, | No. 2:24-CV-02324-NRM-LGD |
| Plaintiff, | OPINION & ORDER |
| -against- | |
| STANLEY OIL & LUBRICANTS, INC., | |
| Defendant. | |

NINA R. MORRISON, United States District Judge:

This proceeding concerns a commercial dispute between Plaintiff General Petroleum GmbH ("General Petroleum"), a German-based manufacturer of automotive, industrial, and marine lubricants, and Defendant Stanley Oil & Lubricants, Inc. ("Stanley Oil"), a New York-based distributor and manufacturer of lubricants. General Petroleum alleges that Stanley Oil, which began distributing General Petroleum's lubricant products in 2019, is now "manufacturing, importing, advertising and distributing counterfeit and infringing products, under the guise that such products are General Petroleum's legitimate products when they are not." Pl.'s Mem. in Supp. of Mot. Prelim. Inj. ("Pl.'s Mem.") at 1, ECF No. 12-1.

After filing suit in this Court against Stanley Oil for federal and state claims for counterfeiting, trademark and copyright infringement, cancellation of trademark registration, unfair competition, deceptive trade practices, breach of contract, and cybersquatting, General Petroleum now seeks a preliminary injunction enjoining Stanley Oil from manufacturing, importing, distributing and/or selling any products using General Petroleum's trademarks, or any confusingly similar marks, and freezing Stanley Oil's assets related to its counterfeiting and other illegal activities. For the following reasons, Plaintiff's motion for a preliminary injunction is GRANTED.

## BACKGROUND

### I.    The Parties

Plaintiff General Petroleum is a German limited liability company with a principal place of business in Frankfurt am Main, Germany.[1]  Compl. ¶ 4.  Founded in 1999, it operates in more than thirty-five countries around the world and offers automotive, industrial, and marine lubricants.  Declaration of General Petroleum Employees Ghiyas Ud Din, Muhammad Zafar Iqbal, and Wajahat Haider ("GP Decl.") ¶¶ 4-5, ECF No. 12-3.  It often operates through wholesale customers that purchase and resell its products.  *Id.* ¶ 10.  General Petroleum operates jointly with and conducts the same business activities as General Petroleum FZE, a company based in the United Arab Emirates ("UAE") and owned by Habib Khan, who also owns

---

[1] The parties each submitted sworn declarations and exhibits accompanying their briefs on the motion for a preliminary injunction. The following facts are taken from their evidentiary submissions and, unless otherwise noted, are undisputed at this stage in the litigation.

Plaintiff General Petroleum. Declaration of General Petroleum Operations Manager Ghiyas Ud Din ("Ud Din Decl.") ¶ 37, ECF No. 23-1.

General Petroleum claims that the first use of its name and brand in the United States occurred in connection with its certification from the American Petroleum Institution in May 2010. Ud Din Decl. ¶ 9. Having operated widely in international markets, it began advertising and selling its products in the United States "since at least as early as 2019." *Id.* ¶ 3.

Defendant Stanley Oil is a New York corporation with a principal place of business at 8 Legend Circle, Melville, New York, 11747. Declaration of Stanley Oil Chief Executive Officer and Shareholder Syed L. Hasnain ("Hasnain Decl.") ¶ 2, ECF No. 22-1. Stanley Oil Chief Executive Officer ("CEO") Syed L. Hasnain ("Hasnain") formed Stanley Oil on June 10, 2019, to "import[] lubricating oils and greases from the [UAE] into the United States." Hasnain Decl. ¶¶ 6-7.

## II. General Petroleum's Marks and Website

The trademark-infringement and unfair-competition claims in this litigation concern several General Petroleum marks (the "General Petroleum Marks"). Two of these marks are now registered with the United States Patent and Trademark Office ("USPTO"), and General Petroleum claims rights in common law in another of these Marks. Compl. ¶¶ 18-21. General Petroleum asserts that it holds common-law rights in a trademark of its name "GENERAL PETROLEUM" ("GENERAL PETROLEUM Mark") based on its advertising and sale of products in the United States under the Mark since 2019. GP Decl. ¶ 5. General Petroleum has also advertised its products

on its website located at the domain GENERALPETROLEUM.DE ("General Petroleum Domain"). *Id.*

Moreover, General Petroleum has adopted a "larger family" of "design marks" to promote its goods and services to customers. *Id.* ¶ 7. General Petroleum registered the first at-issue design mark ("GP Design Mark I") with the World Intellectual Property Organization ("WIPO") at Reg. No. 1051455 on September 16, 2010. Ud Din Decl. ¶ 22. On July 25, 2016, General Petroleum filed a trademark application of Serial Number 79195520 with the United States Patent and Trademark Office ("USPTO") for the same Mark. GP Decl. Ex. A. The USPTO subsequently registered the Mark on September 19, 2017. *Id.* GP Design Mark I includes the General Petroleum logo, its name below the design, and a "GP" at the top right. GP Decl. ¶ 7.



### III.   The Formation of the Parties' Business Relationship

The parties' business dealings began in summer 2019. Hasnain states that he decided to visit the UAE in June 2019 to "identify[] and secur[e] a reliable source from which Stanley Oil could purchase engine oils and lubricants" from "manufacturers and suppliers of lubricating oils and greases." Hasnain Decl. ¶ 8. On June 26, 2019, General Petroleum Operations Manager Ghiyas Ud Din ("Ud Din") met with Hasnain

in General Petroleum's offices in the Hamriyah Free Zone in Sharjah, UAE. Ud Din Decl. ¶ 6. According to Ud Din, Hasnain expressed interest in bringing General Petroleum's products to the United States. *Id.* Hasnain followed up on June 27, 2019, with a WhatsApp message asking Ud Din to discuss "GP brand promotion in USA" with General Petroleum management. *Id.*

Following his meeting with General Petroleum employees, Hasnain "made the executive decision that, going forward, Stanley Oil would purchase engine oils from General Petroleum FZE." Hasnain Decl. ¶ 12. To that end, in August 2019, Stanley Oil submitted its first order for nearly $24,000 worth of industrial General Petroleum products with an advanced cash payment. Ud Din Decl. ¶ 7; GP Decl. ¶ 11; Compl. ¶ 33. On August 13, 2019, General Petroleum informed Hasnain that it received a DEXOS certification — a performance-based standard for engine oils — from General Motors earlier that day. Ud Din. Decl. ¶¶ 7-8.

In August 2019, General Petroleum shipped the industrial products to Stanley Oil in New York. GP Decl. ¶ 12; Compl. ¶ 33. On August 26, 2019, Hasnain formed GENERAL PETROLEUM USA INC. as a business corporation under New York law. Hasnain Decl. ¶ 13, Ex. 2. The first shipment of General Petroleum products arrived with Stanley Oil in New York on or about October 1, 2019. Ud Din Decl. ¶ 10.

"Over the following years, Stanley Oil placed numerous large-scale orders for General Petroleum products, which were again shipped to Stanley Oil." GP Decl. ¶ 13. Relevant to this litigation, General Petroleum described its relationship with Stanley Oil as one of manufacturer-distributor, with "General Petroleum grant[ing]

Stanley Oil a limited license to use the GP Marks solely in connection with the offering and sale of General Petroleum's products." Ud Din Decl. ¶ 11. From 2019 until 2022, General Petroleum sent delivery orders displaying its logo and name to all customers for deliveries in the United States, performed all quality control measures for its products (without receiving any requests for modification from Stanley Oil), and included its email address in all product packaging sold to customers in the United States, which would have directed customer questions or complaints concerning the products to General Petroleum. *Id.* ¶¶ 17-18.

## IV.     Registration of the Stanley Oil GP Mark

On September 9, 2019, Stanley Oil filed an intent-to-use application for registration of a trademark with the USPTO on the Principal Register, which received the Serial Number 6154962 ("Stanley Oil GP Mark"). Hasnain Decl. ¶ 14; Compl. ¶ 36. Hasnain contends that this was the first use of the Mark in the United States. *Id.* ¶¶ 15-19. The Stanley Oil GP Mark displays the letters "GP." GP Decl.

# GP

Ex. C.

General Petroleum asserts that Stanley Oil neither advised General Petroleum it had filed for the Mark nor sought its consent prior to filing for registration. GP Decl. ¶¶ 14-17. Moreover, General Petroleum contends that the "specimen" — a bottle of high-performance, fully synthetic engine oil called "PETROGEN" — that Stanley Oil included in its 2019 application for registration was one of General Petroleum's own products. GP Decl. ¶ 16, Ex. C. While General Petroleum does not

specify the precise date it learned of Stanley Oil's registration of the GP Mark, it claims that it did not learn about it until sometime in 2021.  Compl. ¶ 38.

## V.    The Parties' Ongoing Business Relationship

Communications between the parties continued after the first shipment of General Petroleum goods arrived in New York in October 2019.  On October 28, 2019, General Petroleum informed Hasnain of its global WIPO registration of GP Design Mark I via WhatsApp message.  Ud Din Decl. ¶ 22.

On February 24, 2020, Ud Din sent Hasnain a distribution agreement ("Distribution Agreement").  Ud Din Decl. ¶ 13, Ex. A.  The email asked Hasnain to sign and stamp it.  Ud Din Decl. ¶ 13.  Paragraph 10 of the distribution agreement states that both parties acknowledge that General Petroleum "is the exclusive owner of its trademarks, brand names and company name" and Stanley Oil "shall not infringe or cause to be infringed [General Petroleum's] brands and marks in the territory or anywhere else in the world."  *Id.*  It provided further that the Agreement "does not, expressly or implicitly, grant a Trademark License to [Stanley Oil]."  *Id.* However, the parties never executed the distribution agreement.  Pl.'s Reply in Supp. Of Mot. Prelim. Inj. ("Pl.'s Reply") at 4, ECF No. 23.

General Petroleum states that it sent advertising materials for General Petroleum products to Stanley Oil in as early as September 2020 and offered Stanley Oil a $10,000 credit note for marketing expenses on June 30, 2021.  Ud Din Decl. ¶ 19.  While Hasnain asserts that General Petroleum never provided "any advertising or marketing whatsoever to promote lubricating oils and greases under the GP mark

in the United States" or any "instruction or guidance" to that end, Hasnain Decl. ¶¶ 25-26, General Petroleum provides "a true and correct copy" of a WhatsApp message from October 8, 2019, where Hasnain asks Ud Din to "send some wall posters and some Logo sign, banners to put in workshops Merchandiseing [sic]." Ud Din Decl. ¶ 19.

### VI.    The December 31, 2021, Letter of Undertaking

At some point in 2021, General Petroleum learned that Stanley Oil had registered the Stanley Oil GP Mark when "certain orders were erroneously shipped to Stanley Oil." Compl. ¶ 38; see also Ud Din Decl. ¶ 28.  General Petroleum claims that it "immediately advised Stanley Oil that General Petroleum never consented to the registration of the Stanley GP Mark, and that Stanley Oil's use and registration of the mark violated General Petroleum's rights."  Ud Din Decl. ¶ 28.

In response, and on behalf of Stanley Oil, Hasnain executed a "Letter of Undertaking" addressed to General Petroleum on December 31, 2021, that stated:

> This is to acknowledge that Stanley oil and Lubricant Inc. has registered GP brand before arrival of First shipment as one of import formality GP brand is Intellectual property of General Petroleum FZE. UAE.

> General Petroleum FZE can acquire shares of Stanley oil and Lubricant without any payment or in any other way General Petroleum Deems it fit to ensure that GP brand is Intellectual property and belongs to them [sic].

GP Decl. ¶ 20, Ex. E; Hasnain Decl. ¶ 35, Ex. 7.  Hasnain signed the Letter of Undertaking and had it notarized by a notary public in Suffolk County, New York.[2] GP Decl. Ex. E; Hasnain Decl. Ex. 7.

General Petroleum claims that based on the Letter and other discussions, it understood that Stanley Oil's registration of the mark was "merely a formality" necessary to import General Petroleum's products into the United States.  GP Decl. ¶ 21.   General Petroleum states that it understood that Stanley Oil "would subsequently assign the registration to [it]."  *Id.*

The parties dispute what transpired next.  Hasnain claims that General Petroleum "never responded to Stanley Oil's December 31, 2021, letter of undertaking."  Hasnain ¶ 36.  However, Ud Din avers that General Petroleum made several telephone calls to Hasnain asking him to transfer Stanley Oil's registration but received no response.  Ud Din Decl. ¶ 32.  After Hasnain failed to reply, General Petroleum sent — and provides "a true and correct copy" of — a January 4, 2022, WhatsApp message "in response to [the] Undertaking" in which General Petroleum directs Hasnain to "Pls transfer [the mark] to GP GMbh name."  Ud Din Decl. ¶ 32.

---

[2] There appears to have been some initial confusion from General Petroleum regarding the Letter of Undertaking. In its reply brief, General Petroleum initially contended that "[t]he December 31, 2021 letter attached to Hasnain's Declaration was never received by anyone at General Petroleum and is false."  Pl.'s Reply at 11-12.  This appears to have been a mistake, as General Petroleum's Exhibit E and Stanley Oil's Exhibit 7 include the same Letter of Undertaking.  *Compare* GP Decl. Ex. E *with* Hasnain Decl. Ex. 7.  Stanley Oil correctly notes that General Petroleum has not only proffered the Letter of Undertaking as evidence but also relied on it in support of its legal claims.  Def.'s Surreply in Opp'n to Prelim. Inj. ("Def.'s Surreply") at 4-5, ECF No. 30.  General Petroleum appears to have belatedly recognized its mistake by not relying on the Letter of Undertaking in its pending sanctions motion.  Pl.'s Mem. in Supp. of Mot. for Sanctions ("Pl.'s Sanctions Mem."), ECF No. 24-1.

Hasnain also provides a WhatsApp message from March 9, 2022, in which he sent a copy of the Letter of Undertaking to several General Petroleum employees. Hasnain Decl. II ¶ 5, Ex. 16. With the attached Letter, Hasnain added, "This letter duly noterised [*sic*] was sent the day we were having Zoom meeting as my moral responsibility at my own Probably u were not up dated about this letter so u raised this concern [sic]." *Id.* (typographical errors in original).

**VII.   Stanley Oil's December January 7, 2022, Letter**

According to Stanley Oil, because "General Petroleum never responded to Stanley Oil's December 31, 2021, letter of undertaking," Hasnain avers that on January 7, 2022, he sent General Petroleum a follow-up letter stating:

> Upon your unwillingness to acquire shares in Stanley Oil and Lubricant to spend marketing dollars to develop our GP brand in USA. We want it To make clear, this was unused and abandoned brand in USA And not even a single customer has ever bought it in this area, We have got this brand registered before arrival of any goods under this brand and will invest our resources and marketing dollars to develop it in this extremely competitive market. We will only start buying it from you on the basis of clear understanding that this Brand in USA is registered under our name and we are legitimate owner of GP brand in USA. General Petroleum GmbH has never shipped or manufactured this product in their territory where they are registered.
>
> We are also manufacturing this brand in our facility in Oman. General Petroleum, Shinas Industrial Area, Oman & General petroleum intl FZE Sharjah, UAE Both facilities are owned by Stanley oil and Lubricant Inc [sic].

Hasnain Decl. ¶¶ 36-37, Ex. 8 (typographical errors in original).

Hasnain states that he delivered the letter in a sealed envelope to Amrat Gill ("Gill")[3] in the UAE, who then "hand-delivered the sealed envelope to General Petroleum FZE in the UAE in January 2022." *Id.* ¶ 38.  Gill attests that he delivered the sealed envelope to General Petroleum in January 2022.  *Id.* Ex. 9.  Stanley Oil claims that General Petroleum never responded to either this letter or the December 31, 2021, Letter of Undertaking, and thus failed to contest Stanley Oil's ownership claims of the Mark.  *Id.*

General Petroleum characterizes the January 7, 2022, letter attached to the Hasnain Declaration as "fabricated and fraudulent," and it has become the subject of a separate motion filed by General Petroleum seeking sanctions.  Pl.'s Reply at 2; Pl.'s Sanctions Mot. at 6.  General Petroleum not only asserts that it never received the letter, but also alleges that Stanley Oil fabricated the letter in response to this litigation.  Ud Din Decl. ¶ 33.  In support of its fabrication claim, General Petroleum points to the letter's reference to Stanley Oil manufacturing the brand at "General Petroleum, Shina Industrial area Oman" — a facility that, as General Petroleum explains, did not even exist in January 2022, the date of the letter, because the facility was not incorporated until October 13, 2022.  *Id.*

In response to General Petroleum's challenges, Stanley Oil reasserted that Hasnain delivered the January 7, 2022, letter to Gill in the UAE, who in turn hand-delivered the envelope to General Petroleum FZE in the UAE.[4]  Def.'s Surreply at 5;

---

[3] Gill's relationship to Hasnain or Stanley Oil is unclear.

[4] Hasnain further states that he is "still working to secure a notarized affidavit from Mr. Amrat Gill in the United Arab Emirates" to that end.  Hasnain Decl. II ¶ 8.

Hasnain Decl. II ¶ 8.  As to General Petroleum's contention that the letter was fraudulent because Stanley Oil referred to ongoing manufacturing activities in a facility that did not exist at the time, Stanley Oil contends that the author of the letter, Hasnain, confused verb conjugations because Urdu, not English, is his first language.  Hasnain Decl. II ¶ 12.  Hasnain now claims that he meant to have written, "We will be manufacturing this brand in our facility in Oman. General Petroleum, Shinas Industrial Area, Oman & General petroleum intl FZE Sharjah, UAE.  Both facilities will be owned by Stanley oil and Lubricant Inc."  *Id.* ¶ 13 (emphasis in original).

## VIII.  General Petroleum Design Mark II and USPTO Dispute

On March 31, 2022, General Petroleum filed an application for a second trademark ("GP Design Mark II"), Serial No. 79342412, with the USPTO on the Principal Register, claiming a priority date of March 24, 2022.  GP Decl. Ex. A.  In its application, General Petroleum stated that it also owned the international registration 1665902 of the same Mark as of March 31, 2022.  *Id.*  GP Design Mark II displays "a design of a shaded sphere placed within an incomplete sphere" to the left, a "GP" to the right, and the words "Growth & Prosperity" underneath the "GP" on the right.  *Id.*



General Petroleum's USPTO application for GP Design Mark II prompted the USPTO to initially refuse to register the mark based on a likelihood of confusion with

other registered marks, including No. 6154962, the Stanley Oil GP Mark.  Hasnain

Decl. ¶ 51, Ex. 15 (citing USPTO Action dated January 17, 2023).  General Petroleum

filed a response on September 18, 2023, *id.* ¶ 51, stating:

> With respect to Cited Mark 6, Reg. No. 6154962 in the name of Stanley
> Oil & Lubricants Inc., Stanley Oil & Lubricants Inc. is Applicant's U.S.
> trading partner, Applicant has Stanley Oil's consent to register, and the
> specimen supporting registration of Cited Mark 6 is a photo of
> Applicant's goods which Stanley Oil uses via a license from Applicant.

*Id.* Ex. 15.  The USPTO eventually registered the mark on January 30, 2024.  GP

Decl. Ex. A.

## IX.    Cessation of the Business Relationship

The parties dispute the circumstances surrounding the cessation of their

business relationship.  Stanley Oil claims that it stopped purchasing General

Petroleum products because of what it characterizes as "fraudulent DEXOS labeling"

on those products in December 2023.  Hasnain Decl. ¶ 42.  By contrast, General

Petroleum states that the parties' business relationship terminated after General

Petroleum received information in 2024 that Stanley Oil was manufacturing

counterfeit products in the UAE and Oman and selling them in packaging nearly

identical to General Petroleum's under the name, "General Petroleum USA Inc."

Compl. ¶¶ 54, 57; GP Decl. ¶¶ 24-25, 28-29; Ud Din Decl. ¶ 34.  General Petroleum

includes representative samples of the allegedly infringing products as well as a bill

of lading from February and March 2023 showing counterfeit goods sold by

"GENERAL PETROLEUM USA INC" with product names of "GP PETROGENIC

FULLY SYNTHETIC" and "GP PETROGENIC FULLY SYNTHETIC – OW20." Compl. ¶ 58; GP Decl. ¶ 24, Ex. G.

General Petroleum also claims that in around October and November 2023, *see* Compl. ¶¶ 68-69, Stanley Oil registered several website domain names, GENERALPETROLEUMINTL.COM, GENERALPETROLEUMINTL.DE, and GENERALPETROLEUMUSA.COM, GP Decl. ¶ 25, specifically "to deceive unsuspecting consumers." GP Decl. ¶ 26; *see also* Compl. ¶¶ 67-76. According to General Petroleum, one of the websites, GENERALPETROLEUMUSA.COM, "is a near direct replica of General Petroleum's own website located at the domain GENERALPETROLEUM.DE" and "prominently displays the General Petroleum Logo and Infringing Marks throughout." GP Decl. ¶ 26; *see also id.* Ex. H.

Stanley Oil also filed a trademark application with the USPTO on the Principal Register on January 9, 2024, for a design that appears nearly identical to the General Petroleum logo ("Stanley Oil Design Mark"). GP Decl. ¶ 22-23, Ex. D. General Petroleum claims that Stanley Oil has refused to abandon its application for the Design Mark, which remains pending before the USPTO. GP Decl. ¶ 22. The Stanley Oil Design Mark displays a green-and-blue sphere with a gold core. GP Decl. ¶ 22-23, Ex. D.



On February 20, 2024, General Petroleum sent a cease-and-desist letter to Hasnain, in which it notified Stanley Oil of what it contended was Stanley Oil's use of counterfeit products and infringement of its trademarks. Ud Din Decl. ¶¶ 34-35, Ex. B.

In either late February or early March 2024, Hasnain filed a criminal report in the UAE against General Petroleum for its alleged delivery of products fraudulently labeled with DEXOS authorization, Hasnain Decl. ¶¶ 43-44. General Petroleum claims this report was made not in good faith, but instead in retaliation for its earlier cease-and-desist letter. Ud Din Decl. ¶ 35. General Petroleum states that Stanley Oil "failed to proceed with the criminal report because it had no merit." *Id.*

## X.    General Petroleum Logo Copyright

On March 22, 2024, General Petroleum registered a copyright, United States Copyright Registration No. VA 2-387-961, for the General Petroleum logo ("General Petroleum Logo Copyright"). GP Decl. ¶ 8, Ex. B; Pl.'s Mem. at 3. The United States Copyright Office issued its registration decision date on March 25, 2024. GP Decl. Ex. B. The Copyright consists of a blue-and-green sphere with a gold core. GP Decl. ¶ 8, Ex. B; Pl.'s Mem. at 3.



### XI.     The Instant Litigation

General Petroleum filed the instant action in the Eastern District of New York on March 28, 2024.  Its lawsuit asserts claims against Stanley Oil for "trafficking in goods bearing counterfeit marks under Section 43(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a); trademark infringement under Section 32(a) of the Lanham Act, 15 U.S.C. § 1114(a) and under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); substantial and related claims of trademark infringement and unfair competition under the common law of the State of New York; cancellation of a fraudulently obtained trademark registration under Section 37 of the Lanham Act, 15 U.S.C. § 1119; copyright infringement under 17 U.S.C. § 501 *et seq.*; deceptive trade practices in violation of N.Y. Gen. Bus. Law § 349(a), (h); breach of contract; and cybersquatting under Section 43 of the Lanham Act, 15 U.S.C. § 1125(d)."  Compl. ¶ 2.

General Petroleum represents to the Court that after it filed the Complaint, the parties had been engaged in productive settlement discussions for several weeks and had agreed to many basic terms.  Pl.'s Reply at 13-14.  According to General Petroleum, however, these discussions effectively came to a halt on or around June 12, 2024, when Stanley Oil abruptly fired its previous counsel and hired its current counsel.  *Id.*; ECF Nos. 10-11.

On June 14, 2024, General Petroleum filed this motion for a preliminary injunction.  Pl.'s Mot. Prelim. Inj., ECF No. 12.  On June 17, 2024, Stanley Oil filed its answer to General Petroleum's complaint with ten affirmative defenses and eleven

counterclaims.  Def.'s Answer, ECF No. 13.  On July 29, 2024, General Petroleum filed a Rule 11 sanctions motion against Stanley Oil and its attorney, Panagiota Betty Tufariello of The Law Offices of P.B. Tufariello, P.C., for Stanley Oil's inclusion of what General Petroleum characterized as "numerous false and baseless allegations" and the "fabricated and fraudulent [January 7, 2022,] letter."  Pl.'s Sanctions Mem. at 2.  The Court has granted Stanley Oil until August 30, 2024, to file a response to General Petroleum's sanctions motion.

In the meantime, to aid the Court's consideration of any factual matters that may be necessary to decide Plaintiff's motion for a preliminary injunction, on July 30, 2024, the Court ordered Stanley Oil "to reply to Plaintiff's contention that the December 2021 and January 2022 letters are fraudulent and/or were never delivered to Plaintiff."  After seeking and receiving two extensions of time to file, Stanley Oil eventually produced a surreply and declaration from Hasnain on August 9, 2024, repeating its earlier assertions that Gill hand-delivered the letter and contending that Hasnain's reference to an at-that-time nonexistent manufacturing facility was the product of English not being his first language, allegedly leading him to confuse the present tense with the future tense when referring to that facility in January 2022.  Def.'s Surreply at 6; Hasnain Decl. II ¶¶ 8, 12-13.

## DISCUSSION

### I.   Legal Standard

"[A] party seeking a preliminary injunction [must] show '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citation omitted).  Courts also consider whether "the 'public interest would not be disserved by' the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (citation omitted).  For the reasons set forth below, because the Court finds that General Petroleum has demonstrated a likelihood of success on the merits on several of its claims, the Court need not consider whether GP would also be entitled to preliminary injunctive relief under the "serious questions" standard.

A court ordinarily does not need to consider the balance of hardships where it has found a likelihood of success on the merits in trademark-infringement cases.  *See Guru Teg Holding, Inc. v. Maharaja Farmers Mkt., Inc.*, 581 F. Supp. 3d 460, 475 (E.D.N.Y. 2021).  However, "in the copyright context, courts must always consider the balance of hardships, even when the movant demonstrates a likelihood of success on the merits, and must also determine that an injunction would not disserve the public interest before issuing provisional relief." *Esbin & Alter, LLP v. Sabharwal, Globus, & Lim, LLP*, 403 F. App'x 591, 592 (2d Cir. 2010) (citing *Salinger*, 607 F.3d at 79-80).

## II.   Likelihood of Success on the Merits

### A. Trademark Infringement and Unfair Competition

Under both the Lanham Act and New York common law, a plaintiff demonstrates a "likelihood of success on the merits of a trademark infringement or unfair competition claim 'by showing both [(1)] a legal, exclusive right to the mark, and [(2)] a likelihood that customers will be confused as to the source of the infringing product.'"[5] *Really Good Stuff, LLC v. BAP Invs., L.C.*, 813 F. App'x 39, 43 (2d Cir. 2020) (alteration in original) (quoting *Otokoyama Co. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999)).   An unfair competition claim under New York common law also requires a showing of bad faith.   *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir. 1995).

Neither party contests that the public is likely to be confused by both parties' use of the General Petroleum Marks.[6]   General Petroleum also presented evidence

---

[5] The standards governing trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a) (prohibiting "use in commerce . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive"), and unfair competition or "false designation of origin" claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (prohibiting the "use[] in commerce [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion"), are "substantially the same." *Soter Techs., LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 397 (S.D.N.Y. 2021).

[6] To evaluate whether there is a likelihood of confusion, the Court applies the eight-factor *Polaroid* balancing test consisting of: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual

that actual consumer confusion has already ensued, as it states that customers erroneously shipped certain orders to Stanley Oil.  Compl. ¶ 38; Ud Din Decl. ¶ 27; GP Decl. ¶ 18; *see Biosafe-One, Inc. v. Hawks*, 524 F. Supp. 2d 452, 465 (S.D.N.Y. 2007) ("'It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion,' and therefore the Second Circuit has 'deemed evidence of actual confusion particularly relevant.'") (quoting *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003)).  Moreover, "likelihood of confusion is established as a matter of law where an ex-licensee continues to use a mark after its license expires." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 144 (S.D.N.Y.) (internal quotations and citations omitted), *motion to certify appeal denied*, No. 19 Civ. 1422 (PAE) (VF), 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022).  As a result, the contested issue before this Court is whether General Petroleum is likely to succeed on the merits of its claim that it — and not Stanley Oil — owns the at-issue Marks.

---

consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961)).  Because the parties do not dispute the likelihood of confusion and the disputed Marks are near-identical, the Court need not engage in a lengthy *Polaroid*-factors analysis.  *See Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 105 n.19 ("Here, there is no dispute that the word mark 'MONTANA,' used by both parties, is identical. Since the parties have not specifically addressed the question of whether there is a likelihood of confusion between their logos, the Court declines to rule on this issue.").

*1. First Use of the Marks*

It is black-letter trademark law that ownership of a trademark is founded upon actual use of the mark in commerce, not mere invention of the mark nor its registration with the USPTO. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142, 156-57 (2015); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:1 (5th ed. 2024). Such rights "develop when goods bearing the mark are placed in the market and [are] followed by continuous commercial utilization." *Haggar*, 906 F. Supp. 2d at 105 (alteration in original) (citation omitted). "Those rights include preventing others from using the mark." *B & B Hardware, Inc.*, 575 U.S. at 142. Despite the first-to-use rule, trademark registration on the USPTO's principal register establishes prima facie evidence of the registrant's ownership of the mark under the Lanham Act. *Haggar*, 906 F. Supp. 2d at 106 (citing 15 U.S.C. §§ 1057(b), 1115(a)).

The trademark-infringement and unfair-competition claims here principally turn on which party can claim the Marks' "use."[7] General Petroleum contends that, as manufacturer of the products and developer of the Marks, any "use" of its products through a distributor, Stanley Oil, inures to it. Pl.'s Reply at 3-8. In opposition, Stanley Oil argues that "[t]he use that Plaintiff alleged does not belong to Plaintiff.

---

[7] The specific marks that Stanley Oil has allegedly infringed are the common-law GENERAL PETROLEUM Mark and the two USPTO registered General Petroleum Design Marks. Compl. ¶¶ 89-149. General Petroleum alleges further that the Stanley Oil GP Mark and Design Mark Application are confusingly similar to its protected Marks. *Id.* ¶¶ 92-103. Neither party contests the distinctiveness of the at-issue Marks.

It is Defendant Stanley Oil's."  Def.'s Mem. Opp'n Pl.'s Mot. Prelim. Inj. ("Def.'s. Opp'n") at 7, ECF No. 22.  Stanley Oil cites as evidence its registration of the Stanley Oil GP Mark, filed with the USPTO on September 9, 2019, and with a stated first use in commerce on October 1, 2019.  *Id.* at 7-8 (citing Hasnain Decl. ¶¶ 14-31, Ex. 4). Accordingly, Stanley Oil urges, any use of the marks in the United States from 2019 until 2022 was Stanley Oil's, not General Petroleum's.[8]

Stanley Oil's argument, however, relies on a misunderstanding of the law governing the relations of foreign manufacturers and domestic distributors.[9]  Indeed, while Stanley Oil's argument "would perhaps be valid if [the parties] were separate and independent companies . . . [w]hether a distributor's use of a trademark establishes ownership depends on the nature of its relationship to the manufacturer." *Excell Consumer Prods. Ltd. v. Smart Candle LLC*, No. 11 C 7220(MEA), 2013 WL 4828581, at *21 (S.D.N.Y. Sept. 10, 2013), *opinion supplemented on denial of reconsideration*, 2014 WL 1796657 (S.D.N.Y. May 5, 2014); *see also* 4 McCarthy,

---

[8] To be sure, as Stanley Oil notes, *see* Def.'s Opp'n at 8, under the territoriality principle, "absent some use of its mark in the United States, a foreign mark holder generally may not assert priority rights under federal law, even if a United States competitor has knowingly appropriated that mark for his own use."  *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 156 (2d Cir.), *certified question accepted*, 8 N.Y.3d 994 (2007), *certified question answered*, 9 N.Y.3d 467 (2007).  But as elaborated further below, General Petroleum's use does not depend on this principle.

[9] While no distribution agreement exists, it is clear from the uncontroverted evidence that the relationship between General Petroleum and Stanley Oil was one of manufacturer-distributor.  General Petroleum manufactured and shipped the products to Stanley Oil, GP Decl. ¶¶ 4, 11-13, and Hasnain initiated Stanley Oil's relationship with General Petroleum to "secur[e] a reliable source from which Stanley Oil could purchase engine oil and lubricants" from "manufacturers and suppliers of lubricating oils and greases."  Hasnain Decl. ¶ 8

*supra* § 29:8 ("While disputes over ownership of a mark are usually determined by priority of use, in a manufacturer-distributor dispute, the presumption in favor of the manufacturer applies.").  Contrary to Stanley Oil's suggestion, "[a] distributor does not acquire ownership of a trademark if it merely 'moves the goods in trade.'" *Excell*, 2013 WL 4828581, at *21 (quoting *Haggar*, 906 F. Supp. 2d at 111).  Assuming that the first "use" of the marks in the United States occurred with Stanley Oil distributing General Petroleum's products in 2019, the nature of the parties' relationship at that time is key to resolving the question of the Marks' true ownership.

In cases involving a trademark dispute "between a manufacturer and distributor, courts will look first to any agreement between the parties regarding trademark rights." *Haggar*, 906 F. Supp. 2d at 111 (quoting *Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 403 (S.D.N.Y. 2011), *aff'd*, 462 F. App'x 31 (2d Cir. 2012)); *see also Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1220 (9th Cir.), *as modified*, 97 F.3d 1460 (9th Cir. 1996) (citing *Premier Dental Products v. Darby Dental Supply Co.*, 794 F.2d 850, 854 (3d Cir. 1986)).  Here, both parties agree that no signed distribution agreement was in effect.  *See* Pl.'s Reply at 3-4; Def.'s Opp'n at 9.  Accordingly, the Court must apply a presumption that the manufacturer owns the trademark, which "applies with equal force to cases involving and foreign manufacturers" such as General Petroleum.  *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001); *see also Ushodaya Enters., Ltd. v. V.R.S. Int'l, Inc.*, 63 F. Supp. 2d 329, 336 (S.D.N.Y. 1999) ("[A]s between a foreign

manufacturer and its exclusive United States distributor, the foreign manufacturer is presumed to be the owner of the mark unless an agreement between them provides otherwise.").

On the other hand, "an exclusive distributor may rebut this presumption by showing it gave the goods 'the benefit of its reputation or of its name and business style.'"[10] *Excell*, 2013 WL 4828581, at *22; (quoting *Tecnimed*, 763 F. Supp. 2d at 403); *see also Tactica*, 154 F. Supp. 2d at 600 (stating standard). In order to determine whether Stanley Oil has acquired superior ownership, the Court should look to the following factors:[11]

> (1) which party invented and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; and (4) with which party the public identified the product and to whom purchasers made complaints.

---

[10] The weight of authority suggests that only an *exclusive* U.S. distributor may rebut this presumption. *See Excell*, 2013 WL 4828581, at *22 ("Structural cannot rebut this presumption unless it is an exclusive distributor.") (citing *Tecnimed*, 763 F. Supp. 2d at 403); *see also* 4 McCarthy, *supra*, § 29:8 (5th ed.) ("Only an exclusive distributor can rebut this presumption."). General Petroleum implies that Stanley Oil cannot rebut this presumption because it "never argues that it was the *exclusive* distributor of General Petroleum products in the U.S." Pl.'s Reply at 5 (emphasis in original). However, the record is unclear on this point. Accordingly, the Court applies these factors assuming, without deciding, that Stanley Oil was General Petroleum's exclusive U.S. distributor.

[11] These factors are known as the *Wrist-Rocket* factors, after the case that originally formulated a six-factor test. *See Wrist-Rocket Mfg. Co. v. Saunders*, 379 F. Supp. 902, 913 (D. Neb. 1974), *aff'd in part, rev'd in part sub nom. Wrist-Rocket Mfg. Co. v. Saunders Archery Co.*, 516 F.2d 846 (8th Cir. 1975). "Courts have since condensed and rephrased this six-factor test into the form applied in *Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d at 403," Haggar, 906 F. Supp. 2d at 112 n.24, which are sometimes referred to as the *Sengoku* factors after *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217 (9th Cir. 1996). *Id.* at 112.

*Tactica*, 154 F. Supp. 2d at 600 (quoting *Sengoku*, 96 F.3d at 1220-21).  The Court may also consider "which party possesses the goodwill associated with the product, or which party the public believes stands behind the product."  *Id.* (quoting *Premier Dental Prods. Co.*, 794 F.2d at 854).

Having carefully considered these factors, the Court finds that each one clearly points to General Petroleum's ownership of the marks.  First, General Petroleum invented the marks.  GP Decl. ¶¶ 7-8.  Second, the marks prominently display General Petroleum's name.  *See id.*  The third factor — which party maintained the quality and uniformity of the product — also weighs heavily in General Petroleum's favor.  By "determining what the products' features would be . . . and . . . ensur[ing] the quality of the manufacturing process," General Petroleum maintained the quality and uniformity of the products.  *Tactica*, 154 F. Supp. 2d at 601; Ud Din Decl. ¶ 18 ("General Petroleum performed all quality control measures for its products, and Stanley Oil did not request any modifications be made to General Petroleum's products.").

The fourth factor — which party the public identified with the product and to whom purchasers made complaints — also favors General Petroleum.  The products solely mention General Petroleum, and contain no reference to Stanley Oil.  *Tactica*, 154 F. Supp. 2d at 601 (noting the relevance of the name mentioned).  *Cf. Distillers Brands v. American Distilling Co.*, 26 F. Supp. 988, 989 (S.D.N.Y. 1938) ("Where a trademark indicates a distributor of merchandise rather than the maker, it is the distributor who acquires the trade-mark rights . . . [f]or the public associates the

goods so marked with the distributor and knows not the identity of the maker."). Moreover, customers would have likely directed any complaints to General Petroleum, as General Petroleum's "email address was included in all product packaging sold to United States customers" — and Stanley Oil did not modify or supplement the packaging to direct customers elsewhere.   Ud Din Decl. ¶ 18. Accordingly, General Petroleum can lay claim to any goodwill associated with the product in the United States. *See, e.g., Ushodaya*, 63 F. Supp. 2d at 338 (finding that, because plaintiff Ushodaya was responsible for the recipe and quality of the food product at issue, "absent any agreement to the contrary, the good will associated with the product belonged to Ushodaya.").

Accordingly, because each factor favors General Petroleum, Stanley Oil has wholly failed to overcome the presumption that General Petroleum, the manufacturer, owns the disputed Marks.  *See Tecnimed*, 763 F. Supp. 2d at 404 (two factors favoring manufacturer, one favoring distributor, and one "a draw" is insufficient to overcome presumption in favor of manufacturer).

## 2.  *Stanley Oil's Registration of the GP Mark*

That Stanley Oil registered the Stanley Oil GP Mark does not undermine this conclusion.  For a distributor to acquire rights to a mark — even where it registers it with the USPTO — there must be a "clear manifestation of intent" from the manufacturer to transfer ownership of the mark to that distributor.  *Haggar*, 906 F. Supp. 2d at 111; *see also Software AG, Inc. v. Consist Software Solutions, Inc.*, No. 08 CV 389, 2008 WL 563449, at *17 (S.D.N.Y. Feb. 21, 2008), *aff'd*, 323 F. App'x 11 (2d

Cir. 2009).  "Courts considering this issue in this particular context, where a distributor registers a trademark that is later challenged by a foreign manufacturer, rely on the standard set forth in the Trademark Manual of Examining Procedure ('Trademark Manual')."  *Excell*, 2013 WL 4828581, at *22; *see also Haggar*, 906 F. Supp. 2d at 111; *Ushodaya*, 63 F. Supp. 2d at 335.  The Trademark Manual "provides that a 'United States importer or distribution agent for a foreign manufacturer' may only register the trademark in the United States if it shows (1) written consent; (2) a written agreement that the distributor owns the mark; (3) an assignment of the trademark 'with the business and good will appurtenant thereto.'"  *Excell*, 2013 WL 4828581, at *22 (quoting *Trademark Manual* § 1201.06(a)).

The record contains no evidence suggesting any such intent on General Petroleum's part — much less a clear manifestation of that intent.  *See Software AG*, 2008 WL 563449, at *17 ("There is no evidence in this record of any clear manifestation by Software AG to transfer ownership of the marks associated with its products to a former distributor.").  Most crucially, Stanley Oil fails to produce any written consent from General Petroleum.  *Cf. Excell*, 2013 WL 4828581, at *22 ("Oral permission to register a trademark is not sufficient to establish an agreement for the purposes of this analysis.  Structural must show a 'clear manifestation of intent' by Excell to transfer ownership of trademark rights.").  Indeed, for the reasons discussed below, there is no evidence whatsoever in the present record supporting a finding that General Petroleum acquiesced to Stanley Oil's infringement of the Marks.  To the contrary: in the December 31, 2021, Letter of Undertaking — signed after Stanley

Oil's registration of the Stanley Oil GP Mark — Stanley Oil apparently recognized General Petroleum's lack of consent to its registration of the GP Mark, acknowledging its registration as an "import formality" and reaffirming that the "GP brand is Intellectual property and belongs to [General Petroleum]." *See* GP Decl. Ex. E.

### 3. *Duty to Exercise Control over Licensee's Use of the Marks*

Stanley Oil next argues that even if it were a licensee of the Marks, General Petroleum did not perform its "concurrent duty to exercise control and supervision over the licensee's use of the mark," Def.'s Opp'n at 9 (quoting *Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 212 (E.D.N.Y. 2007) (internal citations omitted)), because General Petroleum "at no point attempted to exercise control." *Id.* at 10. While "naked licensing" in which the "licensor retains no control over the nature or quality of goods or services" may "result in abandonment," Stanley Oil faces a "high burden" on this claim. *Patsy's*, 508 F. Supp. 2d at 212 (quoting *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir. 1983)). "The critical question in determining whether a licensing program is controlled sufficiently by the licensor to protect [its] mark is whether the licensees' operations are policed adequately to guarantee the quality of the products sold under the mark." *Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 110 (2d Cir. 1986).

Stanley Oil's conclusory assertions fail to make this showing. As to Stanley Oil's initial suggestion that General Petroleum failed to exercise control because "no formal distributorship or licensing agreement existed between the parties," Def.'s Opp'n at 9, "[i]t is not necessary . . . for the licenses themselves to contain a written

provision for control; actual control by the licensor is sufficient." *Embedded Moments, Inc. v. Int'l Silver Co.*, 648 F. Supp. 187, 194 (E.D.N.Y. 1986); 2 McCarthy, *supra* § 18:48 ("Even without a formal contractual right of control, if there has been sufficient actual control, then that is sufficient.") (collecting cases).  Indeed, General Petroleum provides uncontested evidence that it performed all quality control measures for its products (without receiving any requests for modification from Stanley Oil), sent delivery orders displaying its logo to all customers, included its email address in all product packaging sold to customers in the United States to direct customer questions or complaints to General Petroleum, and provided advertising and merchandising materials to Stanley Oil at Hasnain's request.  Ud Din Decl. ¶¶ 17-19.  This exercise of control plainly suffices to defeat Stanley Oil's argument.  *See, e.g.*, *Excell*, 2013 WL 4828581, at *12 (finding that "periodic review of product samples was a sufficient level of quality control to maintain [licensor]'s ownership of the trademark"); *Patsy's*, 508 F. Supp. 2d 194, 212 (E.D.N.Y. 2007) (quality control measures sufficient); *Warner-Lambert Co. v. Schick U.S.A., Inc.*, 935 F. Supp. 130, 144 (D. Conn. 1996) (licensor's quality control program negates failure-to-control argument).

### 4. *Bad Faith Under New York Common Law*

To prevail on an unfair competition claim under New York law, General Petroleum must also establish that Stanley Oil acted in bad faith.  *See Jeffrey Milstein, Inc.*, 58 F.3d at 35.  But in the current posture, a demonstration of a likelihood of success on its trademark infringement and counterfeiting claims creates a presumption of bad faith.  *See Christian Dior Couture SA v. Lin*, No. 22-CV-10716,

2023 WL 8483011, at *3 (S.D.N.Y. Feb. 14, 2023) (citing *Salvatore Ferragamo S.p.A. v. Does 1-56*, No. 18-CV-12069 (JPO), 2020 WL 774237, at *4 (S.D.N.Y. Feb. 18, 2020)) (granting preliminary injunction). "Bad faith may be inferred from the extent of similarities between the parties' products." *NSI Int'l, Inc. v. Horizon Grp. USA, Inc.*, No. 20-CV-8389 (JGK), 2022 WL 2110551, at *4 (S.D.N.Y. June 10, 2022) (citing *KatiRoll Co., Inc. v. Kati Junction, Inc.*, 33 F. Supp. 3d 359, 371 (S.D.N.Y. 2014)). And as discussed further below, General Petroleum has presented specific evidence supporting its claim that Stanley Oil acted in bad faith with, inter alia, evidence of its use of counterfeit goods, register of websites with confusingly similar domain names, and continued use of General Petroleum's intellectual property it previously disavowed. GP Decl. ¶¶ 24-27.

### 5. *Stanley Oil's Equitable Defenses*

The Court now turns to Stanley Oil's affirmative defenses of laches, acquiescence, and equitable estoppel. *See* 15 U.S.C. § 1115(b)(9) (providing defenses of including laches, estoppel, and acquiescence to charges of infringement of an incontestable trademark).

The defenses of laches and acquiescence are "similar, but not identical," *Argus Rsch. Grp., Inc. v. Argus Media, Inc.*, 562 F. Supp. 2d 260, 272 (D. Conn. 2008), the key difference being that "acquiescence implies active consent, while laches implies a merely passive consent." *Haggar*, 906 F. Supp. 2d at 139 (quoting *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996)). "A defendant claiming laches must show that: (1) the plaintiff had knowledge of the defendant's use of its mark; (2)

the plaintiff inexcusably delayed taking action with respect to that use; and (3) the defendant would be prejudiced if the court permitted the plaintiff to assert its rights belatedly." *Argus Rsch. Grp., Inc.*, 562 F. Supp. 2d at 272. "Although the defense of laches generally includes proof of actual knowledge by the party claimed to be barred . . . this is not an inflexible rule; a plaintiff may be barred when the defendant's conduct has been open and no adequate justification for ignorance is offered." *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 (2d Cir. 1964) (citations omitted).

By contrast, acquiescence requires the "active consent" of the plaintiff, whether express or implied. *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67-68 (2d Cir. 2002). Thus, to prevail on "a defense of acquiescence, a defendant must show that: (1) the plaintiff actively represented that it would not assert its trademark rights; (2) the delay between that representation and the bringing of suit was not excusable; and (3) the delay caused the defendant undue prejudice." *Argus Rsch. Grp*, 562 F. Supp. 2d at 272 (citing *id.*).

Stanley Oil contends that these equitable defenses bar General Petroleum's claims because: (1) General Petroleum knew about Stanley Oil's U.S. Trademark Registration No. 6154962 since at least the December 31, 2021, Letter of Undertaking; (2) General Petroleum never responded to the January 7, 2022, letter that Stanley Oil claims it hand-delivered to General Petroleum in the UAE (but which, as noted *supra*, General Petroleum claims is a forged document that was never delivered); (3) General Petroleum "acquiesced" to Stanley Oil's ownership of its U.S.

Trademark Registration No. 6154962 in its September 18, 2023, response to the USPTO Office Action; and (4) General Petroleum's "delay between December 31, 2021, and March 2024, when it brought the present suit is just inexcusable." Def.'s Opp'n at 20-21.  Consequently, Stanley Oil urges, General Petroleum's conduct bars their current claims, as Stanley Oil has "invested time, money, effort and resources and purchased almost $6,000,000 worth of product to distribute in the United States." *Id.*

General Petroleum has met its burden of showing that it is highly likely to defeat each of these contentions.  As a fundamental matter, "equity will not give relief to an intentional infringer." *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 256 (S.D.N.Y. 2012) (rejecting trademark-infringer's equitable defenses of laches, acquiescence, and equitable estoppel).  And far from actively or passing acquiescing to Stanley Oil's infringement, General Petroleum has presented substantial (and, in many respects, uncontested) evidence that it acted diligently in pursuing and protecting its rights.

First, as to the December 31, 2021, Letter of Undertaking, General Petroleum avers that it sought the signed letter because of its concerns regarding Stanley Oil's registration of the GP Mark.  In the Letter, Stanley Oil explicitly stated that its registration of the marks before the first shipment was one of "import formality" and that the "GP brand is Intellectual property of General Petroleum."  GP Decl. Ex. E. In light of Stanley Oil's acknowledgment of *General Petroleum's rights* to the brand and its characterization of its own registration as a mere "formality," it is hardly

remarkable that General Petroleum did not immediately pursue litigation. Moreover, contrary to Stanley Oil's contention that General Petroleum failed to act after the letter, General Petroleum provides evidence that it sought the transfer of the Stanley Oil GP Mark:  Ud Din avers that General Petroleum made several telephone calls to Hasnain asking him to transfer Stanley Oil's registration, and, after having received no response, General Petroleum sent a January 4, 2022, WhatsApp message in "response to [the] Undertaking" in which General Petroleum told Hasnain to "[p]ls transfer [the mark] to GP GMbh name."  Ud Din Decl. ¶ 32.

For these reasons, Stanley Oil's argument that General Petroleum should have acquired shares in Stanley Oil without payment "if [it] believed that the intellectual property belonged to them" fares no better.  Def.'s Opp'n at 20.  The Letter of Undertaking — providing that General Petroleum "can acquire shares . . . without any payment or in any other way General Petroleum Deems it fit to ensure that GP brand is Intellectual property and belong to them" — merely offered General Petroleum the opportunity to acquire shares if it deemed fit.  GP Decl. Ex. E.  Instead, General Petroleum chose to pursue transfer of the registration rather than acquiring shares in Stanley Oil.  Ud Din Decl. ¶ 32.  With the benefit of hindsight — especially after this combative litigation — General Petroleum may have acted differently.  But that does not lead this Court to conclude that General Petroleum acted unreasonably at the time, especially given Stanley Oil's acknowledgment that its registration was a formality and General Petroleum owned the brand.

Nor does the contested January 7, 2022, letter advance Stanley Oil's laches or acquiescence defenses. At this stage of the litigation, this Court need not conclusively resolve whether the letter is the "fraudulent" document that General Petroleum claims. But the Court does find that numerous features of the letter and the surrounding circumstances cast grave doubt on its legitimacy, including: (1) the lack of any documentary evidence indicating its delivery or receipt, *cf.* Hasnain Decl. II ¶ 5, Ex. 16 (Hasnain sent the Letter of Undertaking, but not the January 7 letter, to General Petroleum via WhatsApp on March 9, 2022, *after* the alleged delivery of the January 7 letter); (2) Hasnain's curious failure to mention the January 7 letter at a later point, *see id.* (March 9, 2022, WhatsApp conversations in which the parties solely discuss the Letter of Undertaking); (3) Hasnain's description of the Letter of Undertaking as "his moral responsibility" in a WhatsApp message on March 9, 2022 (i.e., two months after he now claims to have delivered the January 7 letter that effectively disavowed Stanley Oil's recognition of General Petroleum's intellectual property rights); (4) the reference to a factory that did not exist at the time the letter was allegedly sent (but did exist at the time Plaintiff claims the letter was fabricated); (5) the sworn averment of General Petroleum's Operations Manager Ghiyas Ud Din that Plaintiff never received the letter, Ud Din Decl. ¶ 33; and (6) the notable contradiction between the Letter of Undertaking, which acknowledged that General Petroleum's brand was its intellectual property, and the January 7 Letter, allegedly sent just a week later, which claimed that Stanley Oil is "legitimate owner of GP brand in USA." *Compare* Hasnain Decl. Ex. 7, *with id.* Ex. 8.

Third, Stanley Oil argues that General Petroleum acquiesced to Stanley Oil's ownership of the Stanley Oil GP Mark in the USPTO proceeding. Def.'s Opp'n at 20; Hasnain Decl. Ex. 15. Although General Petroleum did not explicitly contest Stanley Oil's registration of the GP Mark in its response to the USPTO Office Action — General Petroleum's filing was, after all, in connection with its application for a different mark — it noted that Stanley Oil was General Petroleum's trading partner and that "the specimen supporting registration of Cited Mark 6 is a photo of Applicant's goods *which Stanley Oil uses via a license from Applicant.*" (emphasis added). This language evinces General Petroleum's understanding that Stanley Oil was using the mark as a mere licensee, not owner, and greatly undermines Stanley Oil's claim that General Petroleum either represented or implied that it would not assert its rights. *See Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, No. 12 CIV. 1416 (GBD), 2019 WL 4199842, at *8 (S.D.N.Y. Aug. 15, 2019) ("OBC never led Excelled to believe that it would not assert a claim for infringement.").

Finally, as to the equitable estoppel defense, Stanley Oil fails to identify any misrepresentation by General Petroleum on which it reasonably relied.[12] *See Gucci*

_____

[12] Curiously, Stanley Oil also refers to the doctrine of "unclean hands" in its table of contents of its opposition brief but does not elaborate further. Def.'s Opp'n at 18-21. For the sake of completeness, the Court will briefly consider this defense. While "unclean hands" is "a valid defense in an appropriate trademark infringement or unfair competition case," *Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 272 (S.D.N.Y. 1999), it requires "fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *William Penn Life Ins. Co. of New York v. Viscuso*, 569 F. Supp. 2d 355, 362 (S.D.N.Y. 2008) (internal quotation marks omitted) (quoting *Estate of Lennon v. Screen Creations, Ltd.*, 939 F. Supp. 287, 293 (S.D.N.Y. 1996)). However, it must "relate to [plaintiff's] *acquisition or use* of the . . . trademark, and does not apply to issues which are collateral to the

*Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d at 244 (equitable estoppel in trademark-infringement context requires "(1) a misrepresentation by the plaintiff, (2) reasonable reliance by the defendant, and (3) prejudice").

## B. Cancellation of Trademark Registration

In this litigation, General Petroleum also seeks cancellation of Stanley Oil's registration of the Stanley Oil GP Mark.  District courts have the power to provide such relief.  *See B & B Hardware, Inc.*, 575 U.S. at 155 ("[D]istrict courts can cancel registrations during infringement litigation . . . .") (citing 15 U.S.C. § 1119).  General Petroleum's ground for cancellation is a theory of fraud on the USPTO, Compl. ¶¶ 150-57, which requires General Petroleum to demonstrate that false statements Stanley Oil made in connection with its registration filings "(1) were made with knowledge of their falsity, and (2) were material to the determination to grant the application."  *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 241 (E.D.N.Y. 2009) (quoting *Audiovox Corp. v. Monster Cable Prods., Inc.*, 544 F. Supp. 2d 155, 158 (E.D.N.Y.2008)).  General Petroleum has the burden to prove the fraud by "clear and convincing evidence."  *Tuccillo*, 635 F. Supp. 2d at 242 (quoting *Orient*

---

infringement litigation."  *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 276 (S.D.N.Y. 2022), *aff'd*, No. 23-12-CV, 2024 WL 1152520 (2d Cir. Mar. 18, 2024) (quoting *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999)).  Examples of conduct that may support the application of the doctrine include "when a plaintiff encouraged or induced the commission of a wrong, or . . . a trademark, allegedly infringed by the defendant, is itself deceptive, or . . . the plaintiff procured or maintained his trademark registrations by false or fraudulent misrepresentations."  *Id.* (quoting *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 2005 WL 1164073, at \*4 (S.D.N.Y. May 18, 2005)).  For the reasons set forth above, the record is devoid of any such misconduct by General Petroleum.

*Exp. Trading Co., Ltd. v. Federated Dep't Stores, Inc.*, 842 F.2d 650, 653 (2d Cir.

1988)).

Having already established that General Petroleum owns the Marks, the

Court finds that General Petroleum has established a likelihood of success on the

merits of its cancellation claim by clear and convincing evidence. *See, e.g.*, *Excell*,

2013 WL 4828581, at *26 ("We have determined that Excell is the owner of the

trademarks registered under Structural's name. We therefore order the cancellation

of those registrations."). Moreover, as both parties agree that the manufacturer-

distributor relationship between General Petroleum and Stanley Oil has ended, "[a]

federal registration granted to such an ex-distributor is void ab initio since it was

granted to someone other than the trademark 'owner.'" 4 McCarthy, *supra* § 29:8.

Significantly, as General Petroleum notes, the "specimen" — the sample of

the trademark as used in commerce, *see* 2 McCarthy, *supra* § 19:61.50 — that

Stanley Oil submitted to the USPTO for the registration was one of General

Petroleum's products: to wit, a bottle of high-performance, fully synthetic engine oil

called "PETROGEN" displaying the GP Mark. GP Decl. ¶ 16, Ex. C. Evidence that

the applicant "directly copied the [] mark as part of [its] application" indicates

Stanley Oil's awareness of General Petroleum's use of the identical mark for an

identical product type and is grounds for cancellation. *Tuccillo*, 635 F. Supp. 2d at

242.

In response, Stanley Oil does not deny that the specimen was one of General

Petroleum's products but merely contends that the specimen "belongs to Stanley

Oil, not General Petroleum, since title to the specimen passed to Stanley Oil FOB manufacturing in the UAE." Def.'s Opp'n at 7.  But ownership of the *mark* does not pass to Stanley Oil "merely through the sale and distribution of goods bearing the manufacturer's trademark." *Excell*, 2013 WL 4828581, at *21 (quoting McCarthy, *supra*, § 29:8).  Accordingly, General Petroleum has shown that it is highly likely to succeed on the merits of its cancellation claim.

## C. Trafficking in Counterfeit Goods

The Court next turns to General Petroleum's claim under Section 32 of the Lanham Act, trafficking in counterfeit goods, 15 U.S.C. §§ 1114(1)(a)-(b).  "To establish liability for trademark infringement, a plaintiff thus must show that (1) its marks are valid and entitled to protection, and (2) defendants' use of the plaintiff's marks is likely to cause confusion as to the origin or sponsorship of the defendants' goods." *Kelly Toys Holdings, LLC v. alialialiLL Store*, 606 F. Supp. 3d 32, 49 (S.D.N.Y. 2022) (citing *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 102 (2d Cir. 2010)).  A counterfeit mark is a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.  Because counterfeits "by their very nature, cause confusion," *Kelly Toys Holdings, LLC*, 606 F. Supp. 3d at 50 (quoting *Off-White LLC v. 5HK5584*, No. 19-CV-672, 2020 WL 1646692, at *5 (S.D.N.Y. Apr. 3, 2020)) a court considering an infringement claim based on alleged trafficking in counterfeit goods need not undertake a factor-by-factor analysis of the *Polaroid* likely-to-cause-confusion factors.  Instead, "the Court need only determine the more fundamental question of whether there are items to be confused in the first

place — that is, whether the items at issue here are, in fact, counterfeit and whether [the] Defendants sold those items." *Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003).

General Petroleum is likely to succeed in proving that Stanley Oil solid counterfeit goods. Plaintiff has provided the Court with numerous, "representative examples of General Petroleum's authentic goods compared to Stanley Oil's counterfeit goods." GP Decl. ¶ 24, Ex. G. Stanley Oil responds only that it could not have engaged in counterfeiting because, it claims, General Petroleum never "owned" the Marks at all, since General Petroleum had not yet used the Marks in interstate commerce in the United States at the time of the alleged counterfeiting. Def.'s Opp'n at 6-7. Having already concluded that General Petroleum has met its burden of demonstrating superior rights to the Marks at the relevant time, this argument similarly fails. Accordingly, because Stanley Oil has not rebutted General Petroleum's evidence that Stanley Oil has been using the Marks on counterfeit products, General Petroleum is likely to prevail on this claim.

### D. Copyright Infringement

General Petroleum also claims that Stanley Oil has engaged in copyright infringement under 17 U.S.C. § 501 for using the General Petroleum Logo Copyright, United States Copyright Registration No. VA 2-387-961, in counterfeit products and on the various websites it registered. GP Decl. 8, Ex. B; Compl. ¶¶ 159-66. A claim of copyright infringement requires two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Abdin v. CBS*

*Broad. Inc.*, 971 F.3d 57, 66 (2d Cir. 2020) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

As to the first element, a plaintiff must show that it "either hold[s] a valid copyright registration or [has] applied and been refused a registration as a prerequisite to" suing a defendant for infringing a copyright. *Smith v. L. Off. of Richard St. Paul, Esq., PLLC*, No. 22 CV 5648 (VB), 2023 WL 3570606, at *3 (S.D.N.Y. May 18, 2023) (alteration in original) (quoting *Gattoni v. Tibi, LLC*, 254 F. Supp. 3d 659, 663 (S.D.N.Y. 2017)). General Petroleum has submitted its Certificate of Registration, *see* Compl. Ex. C, which creates a "statutory presumption" that the copyright is valid. *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir. 2001).

To satisfy the second element, General Petroleum "must demonstrate that: (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's [work]." *Abdin*, 971 F.3d at 66 (alteration in original) (quoting *id.* at 110). "Copyright infringement is a strict liability offense in the sense that a plaintiff is not required to prove unlawful intent or culpability, [] and a user does not have to share copyrighted works in order to infringe a copyright." *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 89 (2d Cir. 2016) (citations omitted). In the absence of "seldom available" direct evidence of copying, the plaintiff may also "establish copying circumstantially 'by demonstrating that the person who composed the defendant's work had access to the copyrighted material' and that there are similarities between the two works that are 'probative of copying.'"

*Klauber Bros., Inc. v. URBN US Retail LLC*, No. 1:21-CV-4526-GHW, 2022 WL 1539905, at *4 (S.D.N.Y. May 14, 2022) (quoting *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 51 (2d Cir. 2003)).

General Petroleum has met the necessary showing.  Having compared the General Petroleum Logo Copyright with Stanley Oil's use of the logo on its website, GENERALPETROLEUMUSA.COM, and various products, GP Decl. ¶¶ 26-27, Exs. G-H, it is apparent that "an ordinary observer would 'recognize the alleged copy as having been appropriated from the copyrighted work.'"  *Smith*, 2023 WL 3570606, at *4 (quoting *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)).  And since General Petroleum has shown that (1) Stanley Oil had access to the Logo because of its status as a former distributor of General Petroleum's goods and (2) there "exists substantial similarity between the works," it has established a likelihood of success on the merits.  *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 144 (E.D.N.Y. 2011).

Stanley Oil's counter-arguments on the copyright claim miss the mark.  First, Stanley Oil argues that General Petroleum's March 22, 2024, registration date is "after most of, if not all of, Defendant's use of the allegedly infringing work." Def.'s Opp'n at 11.  This argument, however, betrays the flaws in its premise: not "all" of Stanley Oil's use of the copyright predated the General Petroleum Logo Copyright's March 22, 2024, registration.  Indeed, the May 31, 2024, timestamp of Stanley Oil's GENERALPETROLEUMUSA.COM — which prominently displays the Logo and

offers products bearing its likeness — indicates that Stanley Oil's use occurred, at least in part, after the registration.  GP Decl. ¶ 26, Ex. H.

Second, Stanley Oil argues that because General Petroleum attached a copy of the copyright certificate of registration, rather than a certified copy of the deposit copy, the Court cannot conclusively determine whether Stanley Oil is infringing on a valid copyright.  Def.'s Opp'n at 11-12.  It is true that, because a deposit copy is the copy of the work sent to the United States Copyright Register for registration, "the scope of the copyright is limited by the deposit copy."  *FEMA Test Answers, LLC v. Smith*, No. 22-CV-1108 (MKB), 2024 WL 3178705, at *4 (E.D.N.Y. June 26, 2024) (quoting *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1063 (9th Cir. 2020) (en banc)).  It is also true that, insofar as this Court is aware, no court in this Circuit has yet decided whether a plaintiff needs to submit the deposit copy to obtain a preliminary injunction, as opposed to final judgment on the merits.  But in Plaintiff's favor, courts have held that a copyright-infringement plaintiff may withstand a motion to dismiss without providing the deposit copy, *see, e.g.*, *Smith*, 2023 WL 3570606, at *3 ("plaintiff has sufficiently demonstrated he owns a valid copyright in the allegedly infringed work" without submitting deposit copy); *Klauber Bros., Inc. v. QVC, Inc.*, No. 1:19-CV-09321, 2020 WL 7029088, at *3 (S.D.N.Y. Nov. 30, 2020) ("at the pleading stage, inclusion of copyright certificates along with an assertion that they pertain to the designs in question, is sufficient" to withstand a motion to dismiss), courts have recognized that "[l]ater in the case, plaintiff may need to submit the registration certificate and part of the deposited materials as evidence" that the copyright is

indeed protected. *Smith*, 2023 WL 3570606, at *3 (S.D.N.Y. May 18, 2023).  Given the time-sensitive and — by its very nature — preliminary posture of the temporary injunctive relief sought here, it seems likely that (if pressed to decide the issue), courts would find that this stage of the litigation is more analogous to preliminary motion practice than to trial or final judgment for purposes of determining whether submission of the deposit copy is a prerequisite to obtaining a preliminary injunction.

In support of its motion, General Petroleum has provided a copy of the General Petroleum Logo Copyright, the registration certificate, and numerous examples of Stanley Oil using the Logo on its products and websites.  And Stanley Oil has not challenged the authenticity of any of this evidence. *Cf. Brickstone Realty, Inc. v. Clervius*, No. 14-60755-CIV-UNGARO/OTAZO-REYES, 2014 WL 11776954, at *8 n.11 (S.D. Fla. June 4, 2014) (requiring plaintiff to submit deposit copy of the work as supplement to its motion for a preliminary injunction because of that court's specific concerns regarding the accuracy of the plaintiff's claimed copyright registration).  This evidence clearly demonstrates a substantial similarity between the General Petroleum Logo Copyright and the near-replicas on Stanley Oil's websites and products.  Thus, while General Petroleum may be required to provide the deposit copy before trial or final judgment, the evidence it has submitted to date is sufficient to meet its burden as to this issue in the present posture.

Finally, Stanley Oil's gesture at a defense of "innocent infringement" to bar "in whole or in part" the copyright-infringement claim is unavailing.  Def.'s Opp'n at 10.  This defense requires Stanley Oil to demonstrate "both (1) a subjective good faith

belief that [its] conduct was innocent, and (2) that [its] belief was objectively reasonable under the circumstances." *Golden v. Michael Grecco Prods., Inc.*, 524 F. Supp. 3d 52, 66 (E.D.N.Y. 2021) (quoting *Marshall v. Marshall*, No. 08 CV 1420 (LB), 2012 WL 1079550, at *25 (E.D.N.Y. Mar. 30, 2012), *aff'd*, 504 F. App'x 20 (2d Cir. 2012)). This argument fails because, in light of all the record evidence previously noted, it was not objectively reasonable for Stanley Oil to believe that using the Logo of its longtime business partner to sell its own goods independent of its established manufacturer-distributor relationship was innocent. *See Marshall*, 2012 WL 1079550, at *25 (considering "whether the infringer had received warnings of the infringements").

### E. Cybersquatting

General Petroleum also brings a claim for cybersquatting, which Stanley Oil does not address in its opposition. Section 43(d) of the Lanham Act, the Anticybersquatting Consumer Protection Act, *see* 15 U.S.C. § 1125(d), "was enacted to prevent cybersquatting, an expression that has come to mean the bad faith and abusive registration and use of the distinctive trademarks of others as internet domain names, with the intent to profit from the goodwill associated with those trademarks." *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 323-24 (S.D.N.Y. 2010) (citing *Sporty's Farm, LLC v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 495 (2d Cir. 2000)). A cybersquatting claim requires the plaintiff to demonstrate that: "(1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or

confusingly similar to plaintiff's mark; and (3) that the defendant has a bad faith intent to profit from that mark." *Id.* at 324.

General Petroleum has demonstrated a likelihood of success on the merits. The GENERAL PETROLEUM Mark, in use since 2019 in the United States,[13] was distinctive when Stanley Oil registered the two of the domain names in October and November 2023, and the domain names — GENERALPETROLEUMINTL.COM, GENERALPETROLEUMINTL.DE, and GENERALPETROLEUMUSA.COM, GP Decl. ¶ 25-26 — are "nearly identical and certainly confusingly similar to" the GENERAL PETROLEUM Mark. *New York City Triathlon, LLC*, 704 F. Supp. 2d at 324 (finding www.nyctriclub.com domain name nearly identical to NYC TRIATHLON marks); *Vogster Entm't, LLC v. Mostovoy*, No. 09-CV-1036 (RRM)(RER), 2009 WL 691215, at *4 (E.D.N.Y. Mar. 16, 2009) (defendant held liable for cybersquatting plaintiff's "Vogster" mark by registering domain names "with the mere addition of the words 'award,' 'awards,' or 'game' (e.g., 'vogsterawards.com,' etc.).").

For the third requirement, the Court has already found evidence of significant bad faith on the part of Stanley Oil. Considering the ACPA's non-exclusive, nine-

---

[13] The specific mark that forms the basis for this claim is one based on General Petroleum's name, the GENERAL PETROLEUM Mark. General Petroleum asserts that it has "valid and subsisting common law rights in the GENERAL PETROLEUM Mark" from "its longstanding and continuous use of the GENERAL PETROLEUM Mark in the United States" since as early as 2019. Pl.'s Mem. at 2-3. Common-law trademark rights "develop when goods bearing the mark are placed in the market and followed by continuous commercial utilization" and receive protection under the Lanham Act. *Buti v. Perosa, S.R.L.*, 139 F.3d 98, 103 (2d Cir. 1998) (citation omitted). Because General Petroleum adduces evidence of its longstanding, continuous, commercial use of the Mark, GP Decl. ¶ 5; Ud Din Decl. ¶ 17 (displaying GENERAL PETROLEUM name on delivery order), it holds common-law trademark rights in it.

factor list for considering a defendant's bad faith,[14] the Court finds particularly relevant that: Stanley Oil has no intellectual rights in the domain names, its legal name is not "General Petroleum," it does not make fair or noncommercial use of the mark, it took General Petroleum's name with intent to divert consumers for commercial gain, and it registered multiple domain names that it knows are identical or confusingly similar to marks.  *See New York City Triathlon, LLC*, 704 F. Supp. 2d at 324 (considering factors and concluding plaintiff has shown a likelihood of success on his claim).  As the statutory list is non-exclusive, the Court also finds highly significant Stanley Oil's registration of a domain name with a German ".de" suffix — the same domain suffix as General Petroleum's website GENERALPETROLEUM.DE.  That usage indicates an association with Germany, the country where General Petroleum is based but with which Stanley Oil has no

---

[14] "The nine factors enumerated in the ACPA are: (1) the rights of the person, if any, in the domain name; (2) the extent to which the domain name consists of the legal name of the person; (3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain; (7) the person's provision of material and misleading false contact information when applying for the registration of the domain name; (8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names; and (9) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of section 43."  *New York City Triathlon, LLC*, 704 F. Supp. 2d at 324 n.6 (citing 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX)).

apparent connection.  This domain registration further evinces Stanley Oil's intent to confuse customers seeking General Petroleum products into visiting its site.  *See, e.g.*, *Sporty's Farm LLC*, 202 F.3d at 498-99 (considering statutory and non-statutory factors and concluding more than enough evidence supported finding of bad faith); *BroadBridge Media, LLC v. Hypercd.com*, 106 F. Supp. 2d 505, 512 (S.D.N.Y. 2000) (considering non-statutory factors and concluding that plaintiff has demonstrated likelihood of success on the merits).

### III.   Irreparable Harm

Having concluded that General Petroleum has demonstrated a likelihood of success on the merits of its trademark infringement, unfair competition, trafficking in counterfeit goods, copyright infringement, and cybersquatting claims,  the Court now turns to irreparable harm.  "To satisfy the irreparable harm requirement, [Plaintiff] must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Gilead Scis., Inc. v. Safe Chain Sols., LLC*, 684 F. Supp. 3d 51, 68 (E.D.N.Y. 2023) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).

Under the Trademark Modernization Act of 2020, a trademark-infringement "plaintiff seeking a preliminary injunction is entitled to a rebuttable presumption of irreparable harm upon a court's finding a likelihood of success on the merits." *Guru Teg Holding, Inc.*, 581 F. Supp. 3d at 469 (quoting *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 300 (S.D.N.Y. 2021) and citing 15 U.S.C. § 1116(a)).

While courts must not simply presume irreparable harm in copyright cases after *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), "courts have tended to issue injunctions in this context because 'to prove the loss of sales due to infringement is . . . notoriously difficult.'"[15] *Salinger*, 607 F.3d at 81-82 (quoting *Omega Imp. Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971)).

The Court finds that General Petroleum has established irreparable harm. It has already put forward evidence of consumer confusion. Compl. ¶ 38; Ud Din Decl. ¶ 28. Moreover, the at-issue products "which look remarkably similar to plaintiff['s] product line, have resulted and will likely result in confusion among customers, as well as lost sales and loss of goodwill for plaintiffs." *CJ Prod. LLC*, 809 F. Supp. 2d at 145. Such "loss of reputation and goodwill constitutes irreparable harm." *Really Good Stuff, LLC v. BAP Investors, L.C.*, 813 F. App'x 39, 44 (2d Cir. 2020) (summary order). The evidence that Stanley Oil is trafficking in counterfeit goods also constitutes "unquantifiable irreparable harm to the goodwill and reputation associated with Plaintiff." *Kelly Toys Holdings, LLC*, 606 F. Supp. 3d at 52; *3M Co. v. CovCare, Inc.*, 537 F. Supp. 3d 385, 403 (E.D.N.Y. 2021) ("This loss of control [from counterfeiting] over the quality of products bearing the 3M Marks constitutes textbook irreparable harm."). Moreover, because Stanley Oil's conduct since it was first alerted to General Petroleum's claims indicates that it intends to persist in using General Petroleum's intellectual property and selling the challenged goods unless the

---

[15] Stanley Oil correctly noted that there is no presumption of irreparable harm in copyright cases but does not object to such a presumption in trademark cases. Def.'s Opp'n at 14-16.

Court issues an injunction, the irreparable harm is all the more substantial.  *3M Co.*, 537 F. Supp. 3d at 403 (plaintiff had shown irreparable harm because "nothing in the record indicates that Defendants, absent an injunction, will not sell counterfeit versions of 3M's products in the future").  Accordingly, General Petroleum has shown "actual and imminent" injuries that "cannot be remedied by an award of monetary damages."  *Shapiro v. Cadman Towers Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (citation and internal quotation marks omitted).  Together, the customer confusion, harm to General Petroleum's goodwill and reputation, and likelihood that Stanley Oil will continue violating General Petroleum's intellectual property establish irreparable harm that cannot be addressed through money damages against Stanley Oil's assertion to the contrary.  *Cf.* Def.'s Opp'n at 14-15.

## A. Delay

Stanley Oil argues that General Petroleum delayed too long in filing its complaint and its motion for a preliminary injunction.  To be sure, in trademark-infringement cases, "[t]he presumption of irreparable harm does not apply if 'the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief' . . . [and] may, 'standing alone . . . preclude the granting of preliminary injunctive relief.'"  *Guru Teg Holding, Inc.*, 581 F. Supp. 3d at 469 (quoting *Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995)).  The Second Circuit has "found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction."

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) (citing *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276-77 (2d Cir. 1985)).

The Court will not penalize General Petroleum for attempting to resolve these intellectual-property rights disputes with Stanley Oil for the time period and in the manner it did before seeking a preliminary injunction. It is true that a little more than two years elapsed between General Petroleum's discovery of Stanley Oil's registration of the GP Mark in late 2021 and its discovery of the counterfeit goods in early 2024. But the record indicates that General Petroleum believed that Stanley Oil was merely acting as a licensee: Stanley Oil disavowed rights in General Petroleum's intellectual property in the Letter of Undertaking, and, in its filing before the USPTO, it stated that Stanley Oil was using its goods "via a license" from General Petroleum. Hasnain Decl. Ex. 15. Thus, because General Petroleum had reason (at that time) to believe that the issue was resolved, it had no cause to move for an injunction.

After discovering Stanley Oil's use of the Marks on counterfeit products, its registration of domain names similar to General Petroleum's, and its operation under General Petroleum USA Inc., General Petroleum did not engage in unreasonable delay. After sending a cease-and-desist letter on February 20, 2024, and filing the Complaint on March 28, 2024, General Petroleum then engaged in what appeared to be productive settlement negotiations. However, General Petroleum asserts that once Stanley Oil replaced its counsel on June 12, 2024, ECF Nos. 10-11, it became clear to General Petroleum that further negotiations would likely be futile, *see* Pl.'s

Reply at 13-14, and General Petroleum filed its preliminary-injunction motion two days later, on June 14, 2024.  *See* Pl.'s Mot. Prelim. Inj.  That General Petroleum attempted to negotiate with Stanley Oil rather than immediately file for a preliminary injunction — and thereby save the parties and this Court considerable time and resources from litigating a consequential and complex motion that might not have been necessary — does not bar its success on the present motion.  *See, e.g.*, *Guru Teg Holding, Inc.*, 581 F. Supp. 3d at 470 ("[P]laintiff diligently pursued its legal rights by either recording the assignment of the Marks, registering trademarks with New York state, or negotiating with defendants."); *Two Hands IP LLC*, 563 F. Supp. 3d at 301 (recognizing that "[a]ttempts to settle can provide a buffer only when there is a prospect of resolution"); *Goat Fashion Ltd. v. 1661, Inc.*, No. 19 CIV. 11045 (PAE), 2020 WL 5758917, at *6 (S.D.N.Y. Sept. 28, 2020) ("[G]ood-faith attempts at settlement and investigations are acceptable justifications for delay." (citing *Tough Traveler*, 60 F.3d at 968; *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333-34 (S.D.N.Y. 2011)).

## IV.    Public Interest and the Balance of Hardships

Lastly, to grant injunctive relief the plaintiff must show that the public's interest weighs in favor of granting an injunction. "The Second Circuit has long held that there is a 'strong interest in preventing public confusion.'" *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 505 (S.D.N.Y. 2013) (quoting *ProFitness Physical Therapy Ctr.*, 314 F.3d at 68).  While Stanley Oil's sole argument on this point is that General Petroleum "has not articulated any basis for [Stanley Oil's] goods being

inferior to" General Petroleum's, Def.'s Opp'n at 18, that is not a burden that Plaintiff needs to meet.  For "the public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *New York City Triathlon, LLC*, 704 F. Supp. 2d at 344.  Accordingly, for the same reasons that General Petroleum has demonstrated a likelihood of success on the merits of its underlying claims, it has demonstrated that a preliminary injunction is in the public interest.

In trademark-infringement cases where "the Court has already found a likelihood of success on the merits, it is unnecessary to weigh the balance of the hardships." *Guru Teg Holding, Inc.*, 581 F. Supp. 3d at 475.  However, courts in copyright cases must always consider the balance of hardships, even when the movant demonstrates a likelihood of success on the merits." *Esbin & Alter, LLP*, 403 F. App'x at 592 (citing *Salinger*, 607 F.3d at 79-80).

Stanley Oil's chief contention is that a preliminary injunction would "force Defendant to effectively cease all operations and destroy thousands of dollars of product." Def.'s Opp'n at 17.  However, "it is axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product" and thus has no actual interests that will be harmed. *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 621 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275 (2d Cir. 2012); *see also 3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 197 (S.D.N.Y. 2020) ("It would not be a 'hardship' for Defendant to refrain from engaging in unlawful activities related to [Plaintiff's] brand."); *Warner Bros. Ent. Inc. v. RDR Books*, 575 F. Supp. 2d 513, 553 (S.D.N.Y.

2008) ("The only possible harm to Defendant is the loss of the chance to sell an infringing book, but the law does not protect this type of hardship."). Indeed, "[t]he potential harm to Defendants in restraining their trade in counterfeit and infringing branded goods if a [preliminary injunction] is issued is far outweighed by the potential harm to Plaintiff, its reputation, and its goodwill as a manufacturer and distributor of quality products, if such relief is not issued." *ZURU Inc. v. Individuals, P'ships & Unincorporated Ass'ns Identified on Schedule "A"*, No. 1:23-CV-03146-LGS, 2023 WL 3123945, at *3 (S.D.N.Y. Apr. 27, 2023). Accordingly, the balance of hardships weighs decisively in General Petroleum's favor.

### **CONCLUSION**

For the foregoing reasons, General Petroleum's motion for a preliminary injunction is granted. An order detailing the scope and terms of the injunction pursuant to Fed. R. Civ. Proc. 65(d)(1) is attached to this opinion.

SO ORDERED.

<u>/s/</u> NRM _____

NINA R. MORRISON

United States District Judge

Dated: Brooklyn, New York

September 11, 2024